## PHILADELPHIA RUBBER WORKS CO. v. UNITED STATES RUBBER RECLAIMING WORKS.

(Circuit Court of Appeals, Second Circuit. November 9, 1915. On Motion to Modify Decree, December 22, 1915.)

### No. 121.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—PROCESS FOR RECLAIMING RUBBER FROM VULCANIZED RUBBER WASTE.

The Marks patent, No. 635,141, for a process for reclaiming rubber from vulcanized rubber waste, was not anticipated, and sufficiently describes an operative process which produces substantially the product claimed; also *held* infringed.

Appeal from the District Court of the United States for the Western District of New York.

Suit in equity by the Philadelphia Rubber Works Company against the United States Rubber Reclaiming Works. Decree for complainant, and defendant appeals. Affirmed.

For opinion below, see 225 Fed. 789.

This cause comes here upon appeal from a decree of the District Court, Western District of New York, for injunction and accounting in a suit for alleged infringement of a patent. The patent sued upon is No. 635,141, granted October 17, 1899, to Arthur H. Marks for a "process for reclaiming rubber from vulcanized rubber waste."

The single claim reads as follows: "The described process for devulcanizing rubber waste which consists in submerging the finely-ground rubber waste in a dilute alkaline solution in a sealed vessel, in heating the contents of the vessel to a temperature of 344 degrees Fahrenheit more or less substantially as specified, and in maintaining said temperature for twenty-four hours more or less substantially as specified."

The opinion of Judge Hazel in the District Court will be found in 225 Fed. 789. A few months before his decision was rendered, the District Court for the Northern District of Ohio, Eastern Division, rendered a decision, adverse to the validity of the patent, in a suit brought by this complainant against the Portage Rubber Company. Judge Clarke's opinion will be found in 227 Fed. 623.

Francis J. Wing, of Cleveland, Ohio, and Arthur v. Briesen and Fritz Ziegler, Jr., both of New York City, for appellant.

Charles Neave and Alan N. Mann, both of New York City, for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. Both Judge Clarke and Judge Hazel have elaborately discussed the questions presented in these two causes,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and in their opinions there will be found quotations from the records and testimony, which need not be here repeated; the opinions should be consulted for a comprehensive statement of the controversy. It is sufficient here briefly to indicate why this court has reached the conclusion hereinafter indicated.

There is a mass of testimony in the record, dealing technically and scientifically with the *theories* as to just how the solution of the patent acts upon the rubber scrap when the mixture is heated as prescribed in the patent. It is interesting, perhaps, but of no especial importance, since it is in no way helpful towards finding the answer to the simple question: What did the patentee disclose? He advanced no theory in his specifications; it was not necessary for him to do so. All that the law required of him was a plain statement of his process, set forth in sufficient detail to be understood by a person skilled in the art. If the result of his process is a product which he describes as "devulcanized rubber having substantially the characteristics of fresh rubber and capable of being used in like manner and for like purpose," and if it further appears that this is the first time that this particular process was disclosed to the world, Marks was entitled to his patent. Whether he had some theory when he applied, or has one now, whether the experts have conflicting theories or not, are matters of no importance.

The description of the process is couched in plain and simple language. Finely ground rubber waste is put into a vessel. This vessel itself is located in an outer receptacle capable of containing it and of being tightly closed. No special shape is prescribed for either the vessel or receptacle; they may be cylindrical or square, high or squat; it is sufficient that one shall contain the other with a space to spare between the two. Upon the rubber waste that has been put into the inner vessel there is poured a dilute alkaline solution, a 3 per cent. solution of caustic soda being preferred. The patentee does not state the relative proportions of waste and solution, but he does give very clear and definite instructions as to the quantity of solution which shall be used. There is to be enough of the solution to permeate the finely ground rubber waste and completely submerge it. The inner vessel is then sealed up to prevent evaporation of the solution, and steam is let into the outer receptacle under a pressure of 125 pounds, more or less, equivalent to a temperature of 344 degrees Fahrenheit. This steam pressure is maintained for the time necessary—say 24 hours.

There certainly seems to be no obscurity about these directions. The rubber waste is to be finely ground; the patentee does not say through what size mesh its particles should pass, but it might be supposed that a person skilled in the art would know what would be the range of finely ground waste; and the art of reclaiming rubber from waste (or trying to do so) was an old one. The solution is stated to be "a dilute alkaline solution"—3 per cent. of caustic soda is given as preferred—but it might be supposed that one skilled in the art would know within what limits he might depart from 3 per cent. and still have "a dilute alkaline solution." Presumably all rubber waste is not absolutely identical, some may require a stronger solution than others, and

it might be supposed that a person skilled in the art would know how much he should vary the strength of the dilute solution in order to obtain results with the kind of finely-ground waste he was treating. Certainly the patentee's statement as to temperature and period of steam application is quite specific. Examination of the record indicates that the suppositions above postulated as to what one skilled in the art would know about "finely-ground rubber waste" and "a dilute alkaline solution" are fully warranted. There is no vagueness about the patentee's disclosure of his process.

Does it accomplish its intended result? Out of the mixture of waste and solution does there, when the process is complete, remain "devulcanized rubber having substantially the characteristics of fresh rubber and capable of being used in like manner and for like purposes"?

Defendant put his expert witness on the stand to prove a series of experiments he had made, following the directions of the patent and not producing the result which the patentee claimed. This expert had never had any experience in treating rubber; practically he was not skilled in the art. It is not infrequent in patent causes to find that experiments conducted to show that a patent lacks utility turn out as it was expected they would. Plaintiff calls attention to the statement of a witness, who had had large experience in treating rubber, that by following the Marks patent exactly he had produced a fair product. This defense, inoperativeness, is usually determined by the fate of another defense, infringement. If a patented process fails to produce a fair result, it will not be used commercially. Conversely, if a defendant is found to use the patented process commercially, it will be presumed that he gets a fair product by its use; and it will take more than a series of laboratory experiments to show that no such product results. Reaching as we have the conclusion hereinafter expressed as to infringement, we are satisfied that the patent sufficiently discloses a process which enables a person skilled in the art to produce the result which the patentee indicates. What is the showing of the prior art? Hall, No. 19,172, states that ground rubber waste should be submitted to the "operation of boiling water in caldrons, kettles, or tanks of any description." He says that lime water or alum can be used; but the method of using is manifestly remote from Marks Hall, No. 22,217, submits the ground waste "in a close or proper vessel to the action of steam direct upon the rubber, or in connection with water for the space of 48 hours." That is not the Marks process. Hall, 25,160, provides for placing the ground waste "in a close steam boiler or other suitable vessel, into which steam is conducted through a steam pipe. In its passage through the pipe the steam is superheated." This also is not the Marks process.

It would be a waste of time to enumerate all the prior patents in the record; some suggesting one element, some another, of Marks' process. We may proceed at once to the patent to Mitchell, No. 395,-987, January 8, 1889, which both Judge Clarke and Judge Hazel concur in holding comes nearer than any other to suggesting the process of the patent in suit. The discussion of this patent in their several opinions may be read; they reached opposite conclusions. Judge

Clarke finds that it "comes very close to being, if indeed it is not, a clear anticipation of the process of the Marks patent." Judge Hazel finds that Mitchell's process "defiberized rubber waste by the use of acid and pressure and then devulcanized it by an additional step after washing out the caustic soda," while Marks, on the other hand, "defiberized, desulphurized, and devulcanized waste rubber by a single operation and in so doing achieved a different result from Mitchell." After a careful study of the two patents in the light of the discussion of them by experts and counsel, we entirely concur with Judge Hazel's conclusions. This Mitchell patent cannot be transformed from a two-step process to a one-step process merely because in an English patent (20,289 of 1889) Mitchell recommended a one-step process to be carried out by the use of other agents than those specified in Mitchell, 395,987, and in Marks. In this English patent we find recommendations to use iron in the form of borings or filings, or even larger pieces, turpentine, bi-sulphide of carbon and naptha. The following excerpts from the Mitchell patent, 395,987, indicate to us quite clearly that Judge Hazel's construction was a correct one. After describing a process for removing fiber and mineral matter, Mitchell says:

"Where the waste is unvulcanized this ends the process. * * * When, however, it is desired to devulcanize the rubber, I subject it to further treatment, as follows: Immediately after washing out the mud, and before the contents of the vessel have had time to cool, I again close the cock of the blow-off pipe $H$ and force in steam until a pressure of say 125 pounds and a temperature of 383 degrees Fahrenheit have reached, by maintaining which for a period of from 12 to 36 hours the rubber will be devulcanized."

Before the steam is thus applied the defiberized waste has been thoroughly washed, first with hot and then with cold water. It is the subjection of this thoroughly cleaned waste directly to steam under pressure which, as Mitchell's patent states, "devulcanized" the rubber. We are unable to see how such a process can be held to anticipate Marks' process, or even to approach it so closely as to negative invention.

As to the defense of alleged prior uses, it seems unnecessary to add anything to Judge Hazel's discussion of this branch of the case.

The only witness available to show what process defendant employs was a detective; such process being carried on in secret. We concur with Judge Hazel that his testimony made out at least a prima facie case of infringement. Inasmuch as defendant introduced no evidence to show either what its process was or what it was *not* (Badische Anilin v. Klipstein [C. C.] 125 Fed. 543), we think infringement was sufficiently proved.

The decree is affirmed, with costs.

Walter C. Noyes, Arthur v. Briesen, and Fritz Ziegler, Jr., all of New York City, for petitioner.

Before LACOMBE, COXE, and WARD, Circuit Judges.

### On Motion to Modify Decree.

PER CURIAM. This is a motion to recall the mandate recently sent down in this cause and to direct a modification of the interlocutory

decree which was affirmed. That decree is in the usual form. It finds validity of the patent, title, and infringement, directs recovery of profits and damages since October 9, 1906, and sends the case to a master to take account and report as to such profits and damages since October 9, 1906. Apparently this date is six years prior to the beginning of the suit. It is now asked that the decree be altered, so as to avoid all reference to this date, except for a proviso at the end of the clause that there shall be no assessment or accounting of profits and damages for any infringement committed prior to October 9, 1906.

We see no reason for modifying the interlocutory decree. The master will take account and state profits and damages, if any, for the period from the date named October 9, 1906, down. If either side so wishes, the master will distribute the amount into two or more periods, so that in the event of defendant (upon coming in of the master's report) convincing the court that it should not be held for profits or damages for one or more of those periods, final decree may be entered without any rehearing before the master. The decree, as it stands seems to us sufficiently elastic to allow this practice to be followed; but, if it is not, the District Court has power to make such a regulation for the master's guidance, without any reference to this court for authority so to do.

Motion denied.