WENBORNE-KARPEN DRYER CO. v. CUTLER DRY KILN CO., Inc., et al.

(District Court, W. D. New York. November 2, 1922.   On Application for Rehearing, December 4, 1922.)

No. 295B.

1. Patents ⬡⟶328—1,186,477, claims 2, 4, for process for hardening siccative coatings, held valid.

   The Grosvenor patent, No. 1,186,477, claims 2 and 4, for a process of drying or hardening siccative coatings, *held* valid against the objection that the description was too indefinite, and that the process had been anticipated.

2. Patents ⬡⟶327—Decision in another district on same evidence is of weight.

   Though the decision in another district sustaining the patent in suit is not binding, it is of weight under the rule of comity, if not wholly persuasive if the evidence is the same.

3. Patents ⬡⟶53—Prior use must show complete device.

   For a prior use to anticipate a patent, there must be proof beyond a reasonable doubt that the prior device was completed, and not left in an experimental or untried stage.

4. Patents ⬡⟶69—Prior publication must enable persons skilled in the art to understand invention.

   To serve as an anticipation, a prior publication must embody a description of the thing patented in such full, clear, and exact terms as to enable any person skilled in the art or science to which it relates to understand it without aid from the patent.

5. Patents ⬡⟶328—1,186,477, claims 2, 4, for hardening siccative coatings, held infringed by one defendant, but not by another.

   The Grosvenor patent, No. 1,186,477, claims 2 and 4, for a process for hardening siccative coatings. the novel element of which was the use of an excess of humidity with the heat, *held* infringed by one defendant, but not contributorily infringed by the other by the sale of a kiln in which there was no provision for supplying excess humidity, though such provision had been added by the buyer.

On Application for Rehearing.

6. Stipulations ⬡⟶14(3)—Stipulation held not to admit infringement.

   A stipulation that the supplemental bill bringing in a second defendant might be considered as amended specifically to charge each of the defendants with themselves using the apparatus described in the answer to the original bill does not admit that the second defendant had used the apparatus, where the answer of that defendant denied such use.

In Equity.   Suit by the Wenborne-Karpen Dryer Company against the Cutler Dry Kiln Company, Inc., and the Cutler Desk Company, for infringement of patent.   Decree for complainant against the Cutler Dry Kiln Company, Inc.

Wm. R. Rummler and Cyrus W. Rice, both of Chicago, Ill., for plaintiff.

Drury W. Cooper, of New York City, and J. William Ellis, of Buffalo, N. Y., for defendants.

HAZEL, District Judge.   [1] This action in equity is based on the alleged joint and several infringements by defendant companies of the William M. Grosvenor patent, No. 1,186,477, granted June 6, 1916

(application filed November 20, 1908), for process of drying or hardening siccative coating, varnish, oil paints, mainly used on furniture, automobiles, pianos, phonographs, etc. The object of the invention, as shown by the specification, was to dry, harden, or oxidize such coating very rapidly after freshly applying it, and also to produce coatings superior to those known to the art and produced by different processes. Claims 2 and 4 are involved, and they read as follows:

"(2) In an improved process for drying and hardening siccative coatings, simultaneously subjecting the coatings to the action of the moisture in excess of the natural humidity and heat."

"(4) In an improved process for drying and hardening siccative coatings, simultaneously subjecting the coatings to the action of moisture in excess of the natural humidity and heat and causing forced circulation of the moisture about the coatings."

[2] The defendant Cutler Dry Kiln Company, Inc., in its brief practically admits infringement of these claims, while the defendant Cutler Desk Company denied doing so. Both claims herein considered have heretofore been judicially sustained in an action brought by plaintiff against the Rockford Bookcase Co., 269 Fed. 144, and, though this court is not bound by said decision, which was rendered by Judge Carpenter, yet in a case where the facts are the same the rule of comity would be very helpful, if not wholly persuasive, in the decision of the present controversy. But the defendants contend that the evidence is different from that in the prior case; that two prior uses are here fully established about which no evidence was heretofore given, to wit, the asserted prior use of the Indianapolis Chair & Furniture Company and the Starr Piano Company, and various additional prior publications and patents are urged as anticipatory. The record establishes that the process of drying lumber, for example, which comprised a substantial embodiment of the claims in issue was not unknown at the date of the invention.

The accomplishment of the patentee was due to the simultaneous addition of heat and moisture to the air surrounding siccative coatings in excess of the natural humidity and heat. The process for drying lumber in my opinion was not anticipatory of plaintiff's patent. Although the plaintiff's process was extremely simple in view of its application in other arts, it nevertheless was new and novel in its application for drying and hardening siccative coatings. The prior patents of Schultz, Gathmann, and Victorson do not disclose the particular process with which we are herein concerned. The Smith patent, No. 303,276, of August 12, 1884, to which importance is attached—a patent that was not considered by Judge Carpenter in the Rockford Case—described a method by which the material operated upon is subjected to the action of heat and atmospheric air to which moisture has been imparted, but there is no mention of siccative coatings, and it relates simply to a method of penetrating printed, painted, or dipped surfaces of marble, wood, ivory, or other material. It does not make clear to the art that by the addition of moisture in a dry kiln the drying and hardening of varnishes or other siccative coatings will rapidly occur, and therefore it is not thought anticipatory. Nor, in my opinion, was the process

described in the Grosvenor specification obvious at the date of the application for patent, since it appears by the evidence that the trade quickly appreciated its significance, and, abandoning other processes for accomplishing the result, began using the patented process.

I discover no indefiniteness of description as to the various elements involved in the method or in the claims, and the term "siccative coatings," though not specifically defined in the patent, was nevertheless understood by the skilled in the art to mean coatings of different classes that are converted from a liquid condition to a solid or semisolid condition by the absorption of oxygen. The process of claim 2 plainly requires subjecting the coating to the action of moisture in excess of the natural humidity, and, though nowhere in the specification or claims is the required amount of moisture and heat given, yet to hold the claim or claims in controversy invalid on that ground would be unsubstantial, since the skilled workmen were, I think, readily enabled to make tests and experiments as to the proper amounts to be applied in each specific instance. Those practicing processes are presumed in doing so to depend somewhat on their knowledge and experience. The information contained in the patent is in my judgment sufficiently definite to lead to the use of adequate quantities or amounts of moisture and heat. The patent was not rendered indefinite or inoperative simply because it involved trying out to ascertain the proper amounts of moisture and heat that were required to be applied to different coatings. It sufficed that the specification informed users to use oxidizers stronger than air, to point out distinctions between chemical and physical evaporation, the action of catalytic agencies in prior drying processes, the removal of such difficulties, the combination of increasing heat with fresh air, the presence of moisture to increase the drying as to usefulness, and differences in drying shellac, including the various temperatures and moistures to be used for different varnishes. Such descriptive information, even though the exact humidity or oxygen is not embodied, is nevertheless sufficiently indicative to the skilled engineer or chemist how the process may be used successfully. Philadelphia Rubber Works Co. v. U. S. Rubber Reclaiming Works, 229 Fed. 150, 143 C. C. A. 426; Mowry v. Whitney, 14 Wall. 623, 20 L. Ed. 860; Minerals Separation v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286.

As to prior use: Several witnesses, employees and officers of the Starr Piano Company, testified that the process of claims 2 and 4 was in practical use by it for drying varnish many years prior to the grant of the patent in suit. Indeed, the contention is that moistening means were first used in its kilns in the year 1892 and continuously thereafter in one form or another until the present time. It appears that a kiln was built for drying varnish in the manner specified in the Victorson patent, No. 507,512, wherein the heat and air method of circulation was employed, but without moisture, and that later on water pans were put around the kiln in the Iron Clad building and varnish dried and hardened. Both witnesses Sauer and Pfeiffer swore that the kiln was used for about two years to 1894 or 1895, when the building was destroyed by fire. Other kilns were then installed, and artificial moisture applied, but the varnish blistered. In some instances the

steam was turned on in the drying room to raise the temperature, and the floor sprinkled with water to get a good result, but difficulties continued in regulating the added moisture and drying was not appreciably hastened. In 1902 or 1903 a cabinet or so-called experimental hot box was built. It was heated by steam pipes—water pans were used to furnish moisture—containing a barometer for determining the humidity. Later perforated steam pipes were installed in the hot box to control the moisture to obtain better results, but there still were difficulties in the way of roughness and blistering of the coating. The water pans in the earlier kilns no doubt were used to moisten the air as a preventive of dust settling on the wet varnish and were not regarded as a material element for securing rapid drying of the varnish. The introduction of the cabinet was a continuation of the earlier experiments, but it is not proven that it resulted in actual practicability or completeness, and the record is silent as to any success in drying and hardening the varnish prior to the date of the Grosvenor invention. The evidence does not clearly or satisfactorily show that which is required to anticipate a later patent by prior use. It is not improbable, as plaintiff contends, that portions of the testimony relating to the control of humidity were based upon subsequent familiarity with plaintiff's kilns—kilns that were manufactured by Greef and Nichols, licensees under the Grosvenor patent, and which in 1915 and 1916 were bought by the Starr Piano Company. It is not explained why it installed the Grosvenor process if its prior kilns and processes were capable of accomplishing the desired result. It is also significant that the Starr Company, which presumably appreciated the value of a discovery for hastening the drying and hardening of varnish, did not itself apply for a patent to cover its asserted improvement. It experimented for many years, and, though some progress was perhaps made, yet it never produced or adapted a completed process for accomplishing the result.

[3] In the patent law it is well settled that to anticipate a patent by a prior use there must be proof beyond a reasonable doubt that the device was completed, and not merely left in an experimental or untried stage.

The process at Indianapolis also was an unsuccessful experiment. The testimony of several workmen employed by the company was from their memory only without any corroborative record of occurrences. No exhibit apparatus is submitted, and 19 years have passed since they added moisture as they claim to their method for drying varnish. Their narratives (Schramm, Edwards, and Metzger) are not convincing. In the main Schramm's testimony is to the effect that upon trying unsuccessfully to dry the varnish after using heat and air he placed buckets or pans of water in the drying room, with the result that the varnish dried rapidly. Nothing is shown to have been done to regulate the amount of humidity. The water buckets were discontinued because Schramm noticed that live steam leaking from the valve into the kiln would cause the varnish to dry quickly. This continued, he says, for two years, until May, 1904, without anything being done to regulate the amount of humidity. Edwards testified that the steam from

the leaky valve escaped all day long, but it is singular that neither he nor Schramm disclosed their observations and discovery to any other person. Moreover, the point is not without force that, if enough steam to humidify the air in drying the varnish was emitted, other workmen would no doubt have perceived it, and yet plaintiff's witness Hosmer in rebuttal states that he had charge of the plant and of the steam fitting and machinery, and does not recall any leakage from the valves or pipes in the hot room, and says, if there had been leakage, a report thereof would have been made to him. It is undoubtedly true that both the Indianapolis Company and the Starr Company were constantly endeavoring to devise a better method for accelerating the drying of varnishes used at their plants, but they were not successful, and nothing of value came from their experimentations. There is nothing in the record to satisfy me that what they did was an anticipation of the Grosvenor process in suit. Nor was the adaptation of Heath and Milligan anticipatory.

Various prior publications introduced to anticipate have been passed upon by Judge Carpenter in the prior decision, and I agree with him that they were not anticipations. The Audsley 1882 publication (Defendants' Exhibit 37) relates to drying of Japanese lacquer, which is a different article from varnish and is not classified as such. It contains water as an ingredient, while varnish or siccative coatings ordinarily do not except perhaps in a small amount. Defendants' Exhibit 29 likewise is not a disclosure of the plaintiff's process. There the effect of the heat introduced is to slow the process, and apparently the purpose in doing so was to remove moisture from the air, while here the moisture is added to the air. These prior publications and others in the record which have been examined by me do not require anticipating the involved claims.

[4] The rule of the patent law is that to serve as an anticipation a prior publication must embody a description of the thing patented in such full, clear, and exact terms as to enable any person skilled in the art or science to which the invention relates to understand it without aid from the patent. Cohn v. U. S. Corset Co., 93 U. S. 366, 23 L. Ed. 907, Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064.

[5] As to infringement: It is conceded that the Cutler Dry Kiln Company adapted and used a kiln for drying varnished material which had means for supplying simultaneously moisture and heat thereto while the air is circulated by a fan or blower; and it advertised for sale and sold such kilns. It installed in the H. H. Franklin Company plant a kiln of that description and supplied instructions for its operation. Radiators were connected in the kilns to supply the heat and means for increasing and regulating the temperature of the air. Petcocks were also used to inject live steam into the kiln so sold, and fans were used to circulate the air around the coated surfaces to hasten the drying operation.

In the supplemental bill the defendant Cutler Desk Company is claimed to be a contributory infringer because of its sale of a kiln to the Masterpiece Phonograph Company. The defendant contends that

the kiln sold by it was not intended to be used for moistening the air in the kiln, and indeed that no moistening means, the essential feature of the Grosvenor invention, accompanied the sale. It is shown that the contract for supplying the dry kiln by the Cutler Desk Company did not include a valve for furnishing live steam, and the understanding was that the purchaser would obtain steam from outside of the kiln. It was installed unaccompanied by any connections for heating, and the purchaser afterwards is claimed by defendants to have put in steam apparatus and a reducing valve. Plaintiff's witnesses Roemer and Baer apparently contradict each other on the point of whether defendant furnished the means for supplying moisture to the kiln. Baer swore that the equipment contained a moisture apparatus or means for supplying moisture, but he says it had no moisture apparatus such as he understood went with a dry kiln, while Sweet, who installed the kiln, positively testified that the defendant did not supply any moisture producing means. The point is made that petcocks on the radiators permitted live steam to enter the kiln, but Sweet testified that petcocks were generally used in steam radiators to prevent them from becoming air-bound. The different photographs of kilns disclose means for heating and circulating air and moistening it and measuring temperature and humidity, but that defendant supplied such means is not satisfactorily shown. The inference is not unwarranted that the phonograph company made the connections subsequently and supplied the required means, since at the time of sale and installation only means for heat and air circulation were included.

My conclusion is that claims 2 and 4 in suit are valid and infringed by the Cutler Dry Kiln Company, Inc., but that the evidence is insufficient to support the asserted direct or contributory infringement by the Cutler Desk Company. A decree in conformity with these views may be entered.

### On Application for Rehearing.

William R. Rummler, of Chicago, Ill. (Edward R. Bosley, of Buffalo, N. Y., of counsel), for plaintiff.

J. William Ellis, of Buffalo, N. Y., for defendants.

HAZEL, District Judge. [6] The patent is limited to a process of drying or hardening siccative coatings, and when defendants' kilns are supplied at the same time with moisture and heat from the apparatus, the air being circulated by blower, fan, or other medium to accomplish the process of drying siccative coatings, the infringement in my opinion is complete. The stipulation of the parties to which my attention is now drawn, entered into before trial, states in effect that the supplemental bill bringing in the Cutler Desk Company may be considered amended to specifically charge each of the defendants with themselves using the apparatus described in paragraph 15 of the answer to the original bill, etc. The stipulation does not admit that the Cutler Desk Company is using or had used the process or apparatus for drying siccative coatings. The answer to the original bill of the Cutler Dry Kiln Company, Inc., admits that it used a device embodying the elements of the patent in suit, but that answer is not binding

on the Cutler Desk Company. The latter in its answer denies infringement or use of the process for drying siccative coatings, and its kilns for drying siccative coatings have no means for artificially increasing the moisture. For this reason the injunction against the the Cutler Desk Company should not issue. Counsel for defendants states that, if the decision of the court is affirmed on appeal, plaintiff will have ample opportunity to determine by the testimony of officers of the Kiln Company if any profits and damages have been sustained because of the acts of the Desk Company. This suggests retaining jurisdiction of this question relating to the infringement by the Desk Company until such testimony is taken on the accounting. The decree will therefore provide for granting relief under the supplemental bill as the equities of the case may require when the master makes his report to the court. Allowance of costs also reserved.