**WENBORNE-KARPEN DRYER CO. v. CUTLER DRY KILN CO., Inc. et al.***

(Circuit Court of Appeals, Second Circuit.  May 14, 1923.)

No. 279.

Patents ⚌328—1,186,477, for process for hardening siccative coatings, held void for lack of invention.

The Grosvenor patent, No. 1,186,477, claims 2 and 4, for process for drying and hardening siccative coatings, such as coatings of varnish, shellac, or dryers, which consists of subjecting the coating to the simultaneous action of heat and moisture in excess of the natural humidity of the atmosphere, *held* void for lack of invention, as merely describing in general terms, without specification of any particular amount of humidity or degree of heat, what had previously been done by others.

Appeal from the District Court of the United States for the Western District of New York.

Suit in equity by the Wenborne-Karpen Dryer Company against the Cutler Dry Kiln Company, Inc., and the Cutler Desk Company. From an interlocutory decree, defendants appeal.  Reversed.

For opinion below, see 285 Fed. 73.

Drury W. Cooper, of New York City, and J. William Ellis, of Buffalo, N. Y., for appellants.

William R. Rummler, and Cyrus W. Rice, both of Chicago, Ill., for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge.  The patent in suit is for a process of drying or hardening coatings.  It was applied for on November 20, 1908, and granted June 6, 1916.  Claims 2 and 4 only are relied upon, and read as follows:

"2. In an improved process for drying and hardening siccative coatings, simultaneously subjecting the coatings to the action of the moisture in excess of the natural humidity and heat."

"4. In an improved process for drying and hardening siccative coatings, simultaneously subjecting the coatings to the action of moisture in excess of the natural humidity and heat and causing forced circulation of the moisture about the coatings."

Appellee has succeeded against the Cutler Dry Kiln Company, Inc., and failed against the Cutler Desk Company in the lower court.  However, on a rehearing, the court announced that it would retain jurisdiction over the Desk Company and determine the question of infringement as to it on the coming in of the master's report.  This appeal is from an interlocutory decree.  The issue here is the validity of the patent.  If valid, infringement is conceded.  The inventor says, in his specifications, that his invention relates to "improvements in processes for drying or hardening coatings, such as coatings of varnish, shellac, fillers, or similar materials."  The object of the invention is to provide a method by which the drying of the coatings may be speeded up and coatings produced superior to those attained in other ways. He points out that the freshly applied coating is subjected to the ac-

⚌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Petitions for rehearing and intervention denied 292 Fed. —.

tion of moisture or water vapor in excess of the natural humidity, and also that the drying or hardening is also speeded by the chemical action of the oxidizing agents more powerful than air upon the siccative constituents of the varnish or other coating. He describes his invention by saying:

"I therefore provide an improved method or methods for treating the coatings with water vapor, or an oxidizing agent, or both, which are preferably in gaseous form, and which is preferably carried out under the action of heat, and with automatic means for causing a thorough circulation of the gases."

This contemplates the use simultaneously, with or without forced air circulation, of heat and moisture in excess of the natural humidity and oxidizing agent more powerful than air. We do not understand that the appellant is charged with the use of this process, for it does not use it, but rather the simultaneous use of heat and moisture in excess of natural humidity, with or without air circulation. Appellee's contention is that "moisture in excess of the natural humidity means moisture, artificially or intentionally added to the air in the drying room or kiln." In the specifications, the inventor points out that the water vapor or moisture may be produced from a vessel of water in any suitable manner, and heat applied through coils or otherwise to bring the gases and vapors to the proper temperature, and when the oxidizing solution has been evaporated sufficiently, the temperature is raised slowly to about 100° F. Thereafter the increased heat evaporates the water and aids the action of the gases upon the coating, increasing the drying and hardening action by a steady increase of temperature to about 150° F., and the coating may be readily dried. With shellac the maximum temperature should not exceed 100° F. It is stated that sufficient water should be used to produce a humidity in excess of 60° F. and a temperature varying from 100° to 120°. The inventor says that he cannot specify any particular amount of humidity or any exact percentage by volume of oxygen carriers in the vapors because the requirements of different varnishes vary so greatly, nor can he confine himself to oxides of nitrogen since other carriers of oxygen, such as heated water vapor, and even other oxidizing agents such as chlorine and the like, may suffice. But, he says, oxides of nitrogen have proven very satisfactory. Then he advises using as much or as little water as one finds suitable, and as much circulation of air as found suitable, and you can use an oxide of nitrogen or other oxidizing agent. In other words, the requirement of various varnishes varies so greatly that it is impossible to describe what should be done, but the one who practices this invention must try his best with the conditions he has to meet. Indeed, the inventor says:

"Although I have described my invention with great detail, and have specifically mentioned certain compounds which I prefer to use, I do not desire to be limited to such compounds or details."

Siccative coatings, in the trade, are said to be such as employ the absorption of oxygen, and may be divided into a great many different classes, such as varnishes, paints, enamels, shellacs, and fillers. It is one that is converted from a liquid condition to a solid or semisolid

condition by the absorption of oxygen. The appellee says the invention is a very simple one, saying, "In its simplest form it consists in simultaneously adding heat and moisture to the air surrounding the siccative coatings," and, it adds, its simplicity commends it and points to its great commercial use and success. It admits that moisture has been added to the atmosphere of kilns in which nonsiccative substances, such as green lumber, are dried, saying, "This practice has obtained for many years." But it is claimed that the inventor was the first to overturn the long-accepted opinion of men of the art by proving that oxidation of siccative substances could be greatly hastened by artificially increasing, not only the heat, but also the moisture of the atmosphere, surrounding the coatings. A chemical process, as distinguished from any merely physical process, such as an evaporation of water, is said to have been discovered. This process, by claim 2, is limited to the drying or hardening of siccative coatings, and, as thus restricted and limited, the process consists in subjecting such coatings to the oxidizing action of more moisture and at the same time more heat than the atmosphere surrounding the coatings already has; i. e., both the moisture and the heat are artificially increased, artificially heated and artificially humidified air is employed as an oxidizing agent. The fourth claim differs from the second claim by adding the feature of forced circulation of the moisture about the coatings. Thus, if water vapor in excess of the natural humidity be added to the air, it is found it will greatly increase the oxidizing action of the air. By this increase of heat of the air, it takes up more and more of the water vapor, and the water vapor, held by the air, assists the air's oxidizing action.

The thought is always to enable the oxygen to get at the whole of the siccative coatings equally or with substantial equality so as to prevent a mere top drying. But was this new? For without artificial oxygen or nitrogen there is left nothing but humidified air. The use of a process of using humidified air was old in the drying of lumber; that is, the extraction of moisture from green lumber. Also in the treatment of coatings other than those involving oxidation. It is not claimed that the inventor has discovered any particular degree of heat or any particular content of moisture or any particular rate of circulation which alone or in combination produced a new and unexpected or better result. Humidified air is old. Common illustrations of it are found in office and house heating radiation, and, as this record shows, it has been used in the production of kiln dried lumber. What the inventor does here is to use humidified air in drying varnish, paint, shellac, and fillers instead of drying green lumber with it. Prior publications have described and commented upon such use, and prior uses are shown.

The Star Piano Company had used from 1900 to 1908, the date of the invention in suit, the commercial use at Richmond, Ind., the process of drying varnish substantially as claimed in claims 2 and 4. They used water pans to get the moisture. These pans were placed around the kiln so they could get moisture with the heat. The piano parts were coated with varnish, dried and hardened in this kiln, and by this method the drying operation was reduced from 7 days to 36

hours. One of these kilns was made of lumber, and had pipes which were a means for air circulation and the moisture means were like that in other kilns, and pans and water buckets were used. The length of the application, the degree of heat, the amount of added moisture all varied with the composition of the varnish and with the character of the material to which it was applied. As pointed out, the inventor in the patent in suit was subject to the same indefiniteness as to these considerations. The variations being accorded to the materials and circumstances. In 1901 and 1902, the Indianapolis Chair & Furniture Company, of Indianapolis, provided a drying room in which it placed a line of steam pipes that went around the room. It provided for moisture by placing some buckets of water in the room and the valve was then released, so as to provide a leak and let live steam into the room, and there dried varnished chairs and mission tables with satisfactory results. Most of the time the temperature was from 90° to 100° F.

We think that this was evidence of prior use, such as anticipated the patent in suit. We think that considering these prior uses, together with the various developments by dry kiln manufacturers, each working independent of the other, the inventor did nothing more than to apply commercially the moisture addition step in the drying of varnished surfaces, and that this did not require inventive thought and is not such improvement in the art as rises to the dignity of invention. The ordinary mechanics, practicing the art, who do not claim to be inventors, did, in fact, contrive appliances and use substantially the same processes as the inventor here did, prior to the grant of the patent. The need for speeding the work of drying varnished surfaces was recognized before the inventor entered the field, and it was accomplished by others by adding moisture-producing means to the old dry kilns. Indeed, the specifications, but described what others did before the inventor, and this, necessarily, in indefinite phrase. All that was accomplished was the production of humidified air.

Because of the conclusions arrived at as stated above, it will be unnecessary to determine the motion presented by the appellant to include in the mandate a direction that the appellant shall have leave to apply to the lower court to reopen the case to plead and prove their prior inventions, prior use, and prior publication of the alleged invention of the patent in suit. We think the patent in suit is invalid, and the decree must be reversed.

Decree reversed.